**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BERNARD J. NOBLE, | ) | |
| Plaintiff | ) | |
| | ) | No. 11 C 8530 |
| v. | ) | |
| | ) | |
| | ) | Magistrate Judge |
| CAROLYN W. COLVIN,[1] Commissioner of | ) | Michael T. Mason |
| Social Security, | ) | |
| Defendant | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Bernard Noble ("Noble" or "Claimant") has filed a motion for summary

judgment seeking judicial review of the final decision of the Commissioner of Social

Security ("Commissioner").  Noble seeks Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§

216(i), 223, 1611, and 1614 (the "Act").  The Commissioner has denied his request.

The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. §

636(c).  For the reasons set forth below, Noble's motion for summary judgment is

granted and this case is remanded for further proceedings consistent with this opinion.

**I.  BACKGROUND**

**A.  Procedural History**

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is
substituted for Commissioner Michael J. Astrue as defendant in this suit.

Noble filed an application for DIB and SSI on January 3, 2008, alleging a disability onset date of June 26, 2007.  (R. 21.)  His claim was denied initially on March 13, 2008.  (R. 95-103.)  Noble made a timely request for reconsideration, which was denied on June 27, 2008.  (*Id.*)  Thereafter, Noble requested a hearing, which was held on August 25, 2009 before ALJ Jose Anglada (the "ALJ").  (R. 39-94.)  On October 27, 2009, the ALJ issued a written decision denying Noble's request for benefits.  (R. 18-36.)  Noble filed a timely request for review, which the Appeals Council denied on March 16, 2011.  (R. 8-11.)  The ALJ's decision then became the final decision of the Commissioner.  *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998); 20 C.F.R. § 416.1481.  Noble subsequently filed this action in the District Court.

**B.  Medical Evidence**

Noble seeks DIB and SSI for disabling conditions stemming from chronic heart failure, cardiomyopathy, obesity, hypertension, obstructive sleep apnea, and degenerative disorder of the back.

### 1.  Advocate South Suburban Hospital

On June 28, 2007, Dr. Ricardo Vicuna examined Noble after he complained of chest pain.  (R. 377.)  Dr. Vicuna noted that Noble came to the emergency room because he was experiencing persistent chest pain on his left side, which radiated down his left shoulder.  (*Id.*)  Dr. Vicuna also noted that an initial electrocardiogram and three sets of cardiac enzymes were normal.  (*Id.*)  Noble underwent a chest radiograph and another electrocardiograph.  (R. 346, 376.)  The chest radiograph found left posterior basilar discoid atelectasis, and the electrocardiograph showed a T-wave abnormality indicative of anterolateral ischemia.  (*Id.*)  Dr. Vicuna recommended cardiac

2

catheterization. (R. 377.) This recommendation was based on the radiograph results, as well as Noble's family history of coronary artery disease with angina, his chest pain, his dynamic electrocardiographic changes, and his moderate atrial enlargement left ventricular systolic function. (*Id.*) Dr. Vicuna also reported that Noble had a left ventricular ejection fraction of 29%. (*Id.*)

That same day, Dr. Abdul Ghani, a cardiologist at Advocate South Suburban Hospital, performed a left heart catheterization with selective coronary angiography, left ventriculography, right femoral angiography, and the successful deployment of AngioSeal. (R. 378.) At this time, Dr. Ghani noted that Noble complained of intermittent chest pain and dyspnea from walking one block. (R. 311.) Dr. Ghani reported that there was no significant disease in the left artery and stated that Noble tolerated the procedure well. (R. 378.) He also found that the left ventriculography "reveals ejection fraction of 15-20%." (*Id.*) Dr. Ghani's impression was that Noble had severe nonischemic dilated cardiomyopathy. (R. 379.) On June 29, 2007, Dr. Ghani performed another angiogram, which showed a left ventricular ejection fraction of 20%. (R. 282, 311.) After that time, Noble continued to complain of intermittent periods of chest pain and dyspnea when walking a block. (R. 311.)

## 2. Advocate Christ Medical Center

In August of 2007, Noble began seeing Dr. Marc Silver, Director of the Heart Failure Institute at Advocate Christ Medical Center. (R. 311, 313-14.) Noble reported to Dr. Silver that he had continuing shortness of breath when walking a block, he was snoring, and he was not sleeping well due to the chest pressure. (R. 296.) He also

reported to Dr. Silver that his primary physician, Dr. Charlotte Mitchell, had instructed Noble to limit his activity. (*Id.*)

One month later, on September 26, 2007, Noble reported feeling "tremor-like," "flutter-like" and "thumping" feelings in his chest and he had several episodes of lightheadedness. (R. 292.) On October 25, 2007, Noble saw Dr. Silver again and reported chest pressure and shortness of breath, and stated that he naps daily and gets no regular exercise. (R. 290.) Dr. Silver noted that Noble had a right arrhythmia and he recommended a holter monitor test and sleep study. (*Id.*)

On October 29, 2007, Noble went to the Advocate Christ Medical Center for a holter monitor study. (R. 281.) The holter monitor report noted that Noble had a history of congenitial heart failure and an irregular heart beat. (*Id.*) The report stated: "[t]he rhythm remained normal throughout with average heart rate of 85 beats per minute. Isolated PVCs were noted (total of 235) without any evidence of ventricular couplets, ventricular bigeminy or ventricular tachycardia. There is no evidence of a supraventricular tachyarrhythmia, AV blocks or long pauses either." (*Id.*)

On November 5, 2007, Noble saw Dr. Silver after he again went to the emergency room. (R. 311-12.) Noble had been experiencing more palpitations and slight chest pressure. (R. 311.) At this time, he was not experiencing dyspnea. (*Id.*) He underwent an electrocardiogram, which indicated repolarization abnormalities. (*Id.*) Dr. Silver believed that Noble suffered from dilated cardiomyopathy. (*Id.*) He noted that Noble had normal epicardial coronary arteries. (*Id.*) He also reported that there was no evidence of active myocardial ischemia. (R. 312.) Dr. Silver increased Noble's Carvelidol prescription and sent him home. (*Id.*)

4

After this emergency room visit, Dr. Silver sent a letter to Dr. Mitchell expressing concern about the early onset of Noble's dilated cardiomyopathy. (R. 313.) Dr. Silver also expressed that he remained confident about the treatment and he reserved the decision on implanting a defibrillator until after Noble underwent his CPAP (continuous positive airway pressure) titration study and his heart failure therapy. (R. 313-14.) Dr. Silver also noted that Noble had recently lost some weight and that he was hypertensive. (*Id.*) Dr. Silver believed Carvedilol titration would help Noble's blood pressure and his heart failure. (*Id.*) He also noted that there was no reason Noble could not return to work and that Noble and his wife were planning to take a cruise vacation in the near future. (*Id.*)

On November 7, 2007, Noble saw Dr. Peter Razma at Advocate Christ Medical Center for a sleep study. (R. 300-01.) Dr. Razma concluded that Noble had "[m]oderately severe obstructive sleep apnea, worse in supine position and during REM." (*Id.*) Dr. Razma believed that Noble "should undergo a CPAP titration study for treatment of this," followed by "[c]areful clinical follow-up" as to how effective the CPAP was for treating Noble's sleep apnea. (*Id.*) Dr. Razma further stated, "[c]ertainly his obstructive sleep apnea may be contributing to the development or fostering some worsening of his congestive heart failure." (R. 309.) On November 22, 2007, Dr. Razma noted that Noble had continued dyspnea, poor sleep, and "excessive daytime hypersomnolence." (R. 302.) He recommended a CPAP titration study "immediately." (*Id.*)

Noble saw Dr. Silver again on November 26, 2007, and reported that he was experiencing shortness of breath when walking a short distance, as well as fatigue, and

that he was napping daily. (R. 287.) He also complained of chest pressure and occasional jaw pain. (*Id.*) Dr. Silver noted that Noble was still experiencing pounding or fluttering in his chest once per week, especially at night. (*Id.*) Dr. Silver noted that Noble had been fitted for a mask to help with his sleep apnea, and he recommended that Noble try to exercise and increase his medication. (R. 288.)

On December 3, 2007, Noble was on vacation when he contacted Dr. Silver, reporting the feeling of a pounding heart and coughing spells. (R. 286.) The following day, after taking some prescribed Lasix, Noble was feeling much better and was able to move around more. (R. 285.)

On May 21, 2008, Noble again reported suffering from palpitations, chest pressure and dyspnea after walking a few steps. (R. 411, 413.) Dr. Silver noted that Noble was not wearing his CPAP mask as directed and he occasionally missed his medication. (*Id.*) He also noted that Noble had taken Lasix the previous night and had a good response. (*Id.*) On May 30, 2008, Noble underwent an echocardiogram at Dr. Silver's request. (R. 390.) That report indicated cardiomyopathy, an enlarged ventricle, and mild hypertrophy. (*Id.*) It also indicated the left ventricular systolic function was mild to moderately impaired, the inferior wall was severely hypokinetic compared to the anteroseptal area, and the lateral wall and apex were also hypokinetic with an estimated ejection fraction of 40-45%. (*Id.*) That same day, Noble underwent a stress test, which was stopped after 10 minutes due to shortness of breath. (R. 392.) The electrocardiogram showed a normal rhythm of 73 beats per minute. (*Id.*)

### 3. Dr. Charlotte Mitchell

Dr. Charlotte Mitchell was Noble's primary physician. (R. 327-340.) Dr. Mitchell saw Noble on a regular basis for a number of ailments. (*Id.*) During an office visit on July 12, 2007, after Noble's heart catheterization, Dr. Mitchell noted that Noble complained of chest discomfort. (R. 339.) The following day, July 13, 2007, Dr. Mitchell ordered a Chest PA lateral study, which revealed "[l]inear left posterior basilar density on lateral chest view...that indicates discoid atelectasis... [and] [a]rthritic changes of acromioclavicular joint." (R. 346.)

Dr. Mitchell filled out a medical assessment on February 20, 2008, indicating a diagnosis of dilated cardiomyopathy and hypertensive heart disease. (R. 371.) She indicated an onset date of June 2007, noting that Noble's most recent exam was completed on the date of her written assessment. (*Id.*) She also noted that Noble was experiencing chest pressure in his left chest and jaw, in the form of a squeezing sensation, and this pain radiated into his left shoulder/arm and jaw. (R. 372.) Noble experienced this pain one time per week and the pain endured for three days each time. (*Id.*) His chest pain was relieved by rest. (*Id.*) Dr. Mitchell also noted that there were symptoms of inadequate cardiac output, including recurrent or persistent fatigue occurring during ordinary physical activity; however, Dr. Mitchell did not place any restrictions on Mr. Noble's activity. (R. 373.) Finally, Dr. Mitchell noted that Noble's treatment included prescriptions for Coreg, Aldactone, ASA, and Enalapril, and she indicated that fatigue was a side effect of Noble's medication. (R. 374-75.)

On March 5, 2008, Noble reported to Dr. Mitchell that he had trouble standing and his back pain prevented him from walking or getting out of bed. (R. 384.) Dr. Mitchell diagnosed him with an acute lumbar spine strain. (*Id.*) A CR lumbar spine

7

x-ray was taken, revealing degenerative changes with disc space narrowing at the L4-L5 level and small endplate osteophytes. (R. 388.) An MRI taken on March 14, 2008 indicated straightening of the cervical spine and degenerative changes with anterior osteophytes at C5-C6. (R. 387.)

On September 12, 2008, Dr. Mitchell referred Noble for a consultation with Dr. Bahn for his near syncope. (R. 441.) Dr. Bhan noted that Noble could be at "high risk for sudden cardiac arrest," and as a result, he recommended an implantable cardioverter-defibrillator. (R. 442.) On September 15, 2008, Dr. Bhan performed surgery on Noble, implanting a single chamber implantable cardioverter/defibrillator. (R. 433.)

Dr. Mitchell completed a second medical opinion on August 19, 2009. (R. 453.) In this assessment, she opined that Noble could lift less than ten pounds for up to two-thirds of an eight-hour workday, he could sit for two hours total, he could stand and walk less than an hour total, he could never climb or crawl, and he could only balance, stoop, crouch and kneel for one-third of a full workday. (R. 453-54.) She also noted that Noble would need more than two periods of rest in a reclining position, lasting thirty minutes to an hour each. (R. 455.) She stated that Noble suffered from an increased cardiac workload leading to arrhythmia and her findings were based on an abnormal echocardiogram and electrophysiology. (R. 454-55.) She also noted that there were moderate limitations to his ability to push, pull, lift and stand. (*Id.*)

### 4. Dr. William Ashley

Noble began seeing Dr. William Ashley for his cardiac issues in January of 2009. (R. 421-22.) On January 9, 2009, Dr. Ashley noted that Noble had palpitations and was

suffering from severe shortness of breath.  (R. 421.)  At Noble's next visit, on February

6, 2009, Dr. Ashley noted that Noble was suffering from orthopnea.  (R. 420.)  Dr.

Ashley treated Noble by increasing his prescription for Lasix, and he noted on April 7,

2009, that Noble had some measure of relief from his symptoms.  (R. 419.)  However,

on May 7, 2009, Dr. Ashley noted that Noble again reported fatigue and shortness of

breath.  (R. 418.)  On June 12, 2009, Dr. Ashley reported that Noble had pain and

swelling, and diagnosed him with gynecomastia due to aldactone.  (R. 417.)

Dr. Ashley completed a medical assessment of Noble on August 29, 2009.  (R.

448.)  He reported that lifting and carrying should be limited to less than five pounds.

(*Id.*)  Standing and walking should be limited to less than thirty minutes for an eight-hour

day and less than thirty minutes of walking without interruption, and sitting should also

be limited to less than two hours during an eight-hour day and less than two hours

without interruption.  (R. 449.)  He based this assessment on Noble's abnormal

echocardiogram, his shortness of breath and his minimal activity.  (*Id.*)  Dr. Ashley

opined that Noble can never climb, balance, stoop, crouch, kneel or crawl.  (*Id.*)  The

physical functions of handling, pushing and pulling were also affected by Noble's

condition.  (*Id.*)  He also noted that Noble also has the following environmental

restrictions: heights, moving machinery, temperature extremes, dust, fumes, humidity

and vibrations.  (*Id.*)  Lastly, Dr. Ashley stated that Noble requires more than two

periods of rest of thirty minutes to an hour, with his legs elevated above his heart, during

an eight hour period.  (R. 450.)  He concluded that Noble is "totally and permanently

disabled" due to his congestive heart failure and non-ischemic dilated cardiomyopathy.

(*Id.*)

### 5. State Agency Reviewing Physicians

On February 19, 2008, Dr. Frank Jimenez, a state agency reviewer, completed a physical residual functioning capacity ("RFC") form. (R. 360-67.) He opined that Noble could lift twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours and sit six hours in an eight-hour workday, occasionally climb, and do unlimited pushing or pulling. (R. 360-63.) He also found no other limitations except that Noble must avoid extremes in temperatures. (R. 364.) Dr. Jimenez also noted that Noble's allegations were supported by objective evidence in the file. (R. 367.) On June 24, 2008, Dr. Charles Wabner, a second state agency reviewer, affirmed Dr. Jimenez's assessment. (R. 415-16.) Neither state agency reviewer examined Noble.

### C. Claimant's Testimony

At the time of the August 25, 2009 hearing, Noble was 43 years old and married with six children, ranging in age from 12 years old to 24 years old. (R. 31, 41-42, 63.) He testified that he lives with his wife and five of their children, and he had driven himself to the hearing, which was only about a five minute drive. (R. 41.) He also testified that he has completed two years of college, but he did not receive a degree. (*Id.*)

Noble testified that his disability began on June 26, 2007. (R. 21.) In the years prior to his disability, Noble held a number of different full-time jobs. (R. 43-50.) Noble worked as a self-employed tow truck driver for three years, until his injury in 2007. (R. 43-44.) Prior to this, from 2000 to 2004, he worked for a railroad company as a car man, inspecting the trains and doing minor repairs on train cars. (R. 44-45.) Before 2000, Noble had worked in road construction and cement flooring for about 15 years.

10

(R. 46-47.)  At times, Noble also worked for the park district as a wrestling coach, which included some custodian tasks, such as cleaning up the facilities before the children arrived for wrestling practice.  (R. 48-49.)

Noble testified that the medication for his congestive heart failure, or cardiomyopathy, prevents him from seeking employment.  (R. 50-51.)  Noble stated that the medication keeps him drowsy, light-headed and weak.  (*Id.*)  At the time of his diagnosis, his ejection fraction was 29 percent, and the last time it was tested, it was 45 percent.  (R. 51-52.)  He is currently taking Enalapril, Carvedilol, Spironolactone, and Coenzyme Q10, as well as Furosemide, a water pill, which causes him to urinate a lot. (R. 73.)

At the time of his diagnosis, Noble said that he felt like he was having a heart attack, there was pressure on his chest, tingling in his arm, pain in his jaw, shortness of breath, and he was unable to sleep.  (R. 52.)  He tried to go to work that morning, but instead, he stayed in bed all day until his wife took him to the hospital at 11:00 pm.  (*Id.*) The medications he was prescribed for his heart problems do not relieve his symptoms. (*Id.*)

Noble testified that he had a defibrillator implanted in September of 2008.  (R. 53, 57.)  He said that his doctor wanted to take this course of action in order to correct his heart rate if necessary.  (R. 53.)  After this, he underwent a stress test, and based on the results, his doctor recommended that Noble refrain from any running, jogging, or walking too far.  (R. 56.)

According to Noble, when he tries to walk, he can only make it half a block, and he gets short of breath after 10 to 15 yards.  (R. 60.)  He can stand in place for about 20

11

minutes at a time.  (*Id.*)  He stated that he can sit, as long as his heart rhythm remains

steady.  (R. 62.)  However, he also testified that when he has symptoms, such as rapid

or slow heart rhythm, he has to lie down until the defibrillator kicks in or the symptoms

disappear.  (R. 60-62.)  Noble is restricted in the way he bends down because it can

cause him to feel light-headed.  (R. 62-63.)  He stated that he can lift a 20-pound or

10-pound object, but it makes him exhausted, and even lifting 10-pounds causes an

increase in his heart rate.  (R. 75-76.)  He also testified that he would be unable to sit at

a desk for 8 hours.  (R. 78.)

Noble stated that on a typical day, he gets up at 7:00 am, showers and brushes

his teeth, and then gets his children off to school around 8:00 am.  (R. 63-66.)  He then

spends an hour watching television and for the rest of the day, he is in bed sleeping

until his children return home around 4:00 pm.  (R. 63-66, 72.)  Sometimes he takes his

three youngest boys to football practice at 4:30 pm, but he sits in the car until they are

finished at about 6:00 pm.  (R. 63, 66-67.)  In the evenings, he typically eats dinner,

watches tv and helps his children with their homework.  (R. 67.)  Noble's wife does the

grocery shopping and prepares dinner for the family.  (R. 67, 76-77.)  Noble said he

feels exhausted for most of the day and typically goes to bed by 9:00 pm.  (R. 63.)

Noble stated that after he walks to the kitchen, he feels like he ran a mile.  (R.

70.)  He said he has felt this way since 2007, and prior to this time, he felt fine, and he

was capable of heavy labor at work.  (R. 70.)  He stated that he would not be able to

hold a job where he sat at a desk for 8 hours a day because he would fall asleep.  (R.

71.)  Noble also testified that he wears a CPAP mask for 10.5 hours at night and 5.5

hours during the day to help him sleep.  (R. 72.)

12

Noble's last appointments with his primary doctors, Dr. Mitchell and Dr. Ashley, were the week before the ALJ hearing. (R. 67-68.) He usually sees his primary care doctor, cardiologist, and electrophysiologist once each month. (R. 68.) He told Drs. Mitchell and Ashley about his extreme fatigue and they advised him to limit his activities. (R. 72-73.) He also testified that he previously had a very active lifestyle and everything just stopped at once. (R. 77-78.) He used to play tackle football, wrestle with his sons, and maintain his tow truck business, and then everything had to end. (*Id.*)

### D. Testimony of Claimant's Wife

Ms. Noble testified that she and Noble have been married for 15 years. (R. 80.) She described her husband as a very active man until he became ill in 2007. (*Id.*) He used to play tackle football, do home repairs, yard work, carpentry and help with the grocery shopping. (*Id.*) Ms. Noble also testified that his illness came on suddenly and he has been very limited since then. (R. 81.) She stated that he now lays in bed for 16 or 17 hours a day and that even walking short distances causes heavy breathing. (R. 81-82.)

Ms. Noble accompanied her husband to the appointment where the doctor recommended the implantation of the defibrillator. (R. 83.) She asked about the benefits of the defibrillator and stated that the doctor could not give a definitive answer. (R. 84.) The doctor told her that because Noble's ejection was so low, at 29%, he did not know if it would help, but it was worth a try. (R. 84.)

Ms. Noble stated that after the implantation of the defibrillator, her husband has become more short of breath when he walks and spends most of the day in bed. (R. 82-83.) In addition to the increased daytime sleep while he is laying in bed and using

his CPAP machine, she said he falls asleep during the day, sometimes in the middle of

conversations. (R. 82.) She stated that she did not see much of an improvement with

the defibrillator. (R. 85.)

### E. Testimony of the Vocational Expert

Lee Knutson testified as the vocational expert ("VE"). (R. 85.) The ALJ asked

the VE to consider a hypothetical person with a similar age, education and past relevant

work experience as Noble. (R. 88.) The ALJ then asked the VE to assume that the

individual had the RFC to perform a full range of light work with the following exceptions:

the individual can lift and carry 20 pounds occasionally and 10 pounds frequently, he

can be on his feet standing or walking 2 hours in an 8-hour workday, he should not be

exposed to extreme temperatures, he can only occasionally bend, and he can only

occasionally negotiate stairs or climb. (*Id.*) The VE testified that such an individual

would be unable to perform any of Noble's past work and would be restricted to

sedentary work that did not require prolonged standing. (*Id.*) The VE testified that in

the Chicago region there were positions that the hypothetical individual could perform,

including: 2,200 positions as a surveillance system monitor or unskilled security person,

2,900 positions as a sedentary order clerk for food or beverage, and 3,300 positions as

a sedentary assembler, such as a final assembler. (R. 88-89.)

The ALJ then asked the VE to further assume that the individual could lift and

carry no more than 10 pounds occasionally, could walk no more than a half block at a

time, could stand no more than 20 minutes at a time and could only occasionally bend.

(R. 89.) He then asked how that would affect the individual's performance of any of the

jobs the VE suggested. (R. 90.) The VE responded that as long as the individual could

sit and stand throughout a full workday, there would be little impact on the sedentary jobs he mentioned.  (*Id.*)

The ALJ then directed the VE to the medical assessment completed by Dr. Mitchell and asked if there was anything contained in the assessment that would adversely impact the claimant's performance of the suggested positions.  (R. 90.)  The VE responded affirmatively, highlighting that her assessment was that Noble is unable to sustain sitting and standing through a full 8-hour workday and that he has posture limitations while sitting.  (*Id.*)  The VE concluded that, according to the assessment, the claimant could work no longer than a two-hour workday.  (R. 91.)

The ALJ then directed the VE to comment on the medical assessment completed by Dr. Ashley.  (R. 91-92.)  The VE stated that the second assessment also indicated that the claimant would be unable to work a full 8-hour workday because he would require rest and reclining periods, including laying down twice a day.  (R. 92.)

## II.  LEGAL ANALYSIS

### A.  Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d

15

535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  This

Court will "conduct a critical review of the evidence" and will not let the Commissioner's

decision stand "if it lacks evidentiary support or an adequate discussion of the issues."

*Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he

"must build an accurate and logical bridge from the evidence to his conclusion."

*Clifford*, 227 F.3d at 872.  The ALJ must "sufficiently articulate [his] assessment of the

evidence to assure us that the ALJ considered the important evidence…[and to enable]

us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th

Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.

1985)).

### B.  Analysis Under the Social Security Act

In order to qualify for SSI or DIB, a claimant must be "disabled" under the Act.  A

person is disabled under the Act if "he or she has an inability to engage in any

substantial gainful activity by reason of a medically determinable physical or mental

impairment which can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C.  § 423(d)(1)(A).  In determining whether a claimant is disabled, the

ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently

employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's

impairment is one that the Commissioner considers conclusively disabling, (4) if the

claimant does not have a conclusively disabling impairment, whether he can perform his

past relevant work, and (5) whether the claimant is capable of performing any work in

the national economy."  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The

claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, he found that Noble had not engaged in substantial gainful activity since June 26, 2007, the alleged onset date of disability. (R. 23.) At step two, the ALJ found that Noble's cardiomyopathy, obesity, hypertension, sleep apnea, and degenerative disorder of the back were severe impairments. (*Id.*) At step three, the ALJ found that Noble does not "have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)" (the "Listings"). (*Id.*) Next, the ALJ concluded that Noble had the RFC "to perform less than the full-range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)." Specifically, the ALJ found that Noble "occasionally can lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk 2 hours in an 8-hour workday; occasionally bend; and occasionally climb or negotiate stairs. Additionally, [Noble] should not be exposed to extremes of temperatures." (R. 24.) At step four, the ALJ determined that Noble was unable to perform any past relevant work. (R. 31.) At step five, the ALJ found that there were a significant number of jobs in the national economy that Noble could perform. (*Id.*)

On appeal, Noble argues that the ALJ's opinion is improper for several reasons. First, he argues that the ALJ rendered an improper step three analysis by failing to build a logical bridge between the evidence and the conclusion that Noble did not meet the

17

criteria of any of the Listings.  He also contends that the ALJ rendered an improper RFC determination by failing to give controlling weight to two separate treating physicians and by failing to explain the reasoning for giving weight to the non-examining state-agency reviewers.  Finally, Noble argues that the ALJ's credibility determination was legally insufficient.  We will address each of Noble's arguments below.

### C. The ALJ's Step-Three Analysis was Insufficient.

Noble first contends that the ALJ erred in step three of the analysis in finding that his impairments do not meet or medically equal an impairment under Listing 4.02.  This listing addresses "Chronic Heart Failure."  Noble contends that the ALJ ignored relevant medical evidence that establishes that he does in fact have an impairment that meets or is medically equal to Listing 4.02.  The Commissioner argues that the ALJ's analysis at step three was sufficient.

At step three, "in considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."  *Barnett v. Barnhart,* 381 F.3d 664, 668-69 (7th Cir. 2004) (finding the ALJ's "two sentence consideration of the Listing of Impairments [was] inadequate and warrants remand").  "In particular, the ALJ is required to evaluate any evidence of the required criteria that is favorable to the claimant."  *Firkin v. Astrue,* No. 11-578, 2012 WL 1454002, at *9 (N.D. Ill. Apr. 25, 2012); *see also Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) ("[the ALJ's] failure here to evaluate any of the evidence that potentially supported [claimant's] claim does not provide much assurance that he adequately considered [the] case."); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (remanding where the ALJ failed to mention the strongest piece of evidence

supporting an impairment).  In addition, whether a "claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."  *Barnett*, 381 F.3d at 670.

Here, in his step three analysis, the ALJ stated that he paid "particular attention to listings 4.02 (chronic heart failure) and 1.04 (disorders of the spine)."  The ALJ added that he also considered the cumulative effects of the claimant's obesity on his impairments.  However, without specifically discussing any of the evidence relating to these two listings, the ALJ simply concluded: "[t]he medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listing impairment, individually or in combination."  (R. 24.)

We agree with the claimant that this abbreviated step three analysis is insufficient.  We have reviewed the medical record in this case and we find that there are numerous pieces of evidence that could support a finding that Noble meets the requirements of listing 4.02.[2]  Noble was diagnosed with chronic heart failure, and on at

---

[2] Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity...is met when the requirements in both A and B are satisfied.
  A. Medically documented presence of one of the following:
     1. Systolic failure ... with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
     2. Diastolic failure...  AND
  B. Resulting in one of the following:
     1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or
     2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period ..., with evidence of fluid retention...from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization; or

least two occasions, medical testing revealed an ejection fraction rate of less than 30%, which is an element of Listing 4.02. In addition, the record indicates that Noble was unable to perform during an exercise test due to dyspnea, which is also relevant to the analysis under Listing 4.02. The record demonstrates that Noble had been diagnosed with cardiovascular system disease, namely dilated cardiomyopathy and hypertensive heart disease, and he also had a history of systemic hypertension, palpitations, and chest pressure, and suffered from obesity, obstructive sleep apnea, and daily fatigue. Instead of addressing any of this evidence and explaining why it did not support a finding that Noble's condition met Listing 4.02, the ALJ summarily concluded that the "medical evidence" did not meet "listing-level severity." Where, as here, some of the evidence indicates that Noble may have met the requirements for this listing, the ALJ is required to consider this evidence in relation to his step three finding. *See, e.g., Franklin v. Astrue,* No. 12-230, 2013 WL 652548, at *2-3 (S.D. Ind. Feb. 21, 2013) (granting claimant's motion for summary judgment where the ALJ failed to note at step three that there were a number of instances where claimant's ejection fraction was below 30%); *see also Brandisi*, 315 F.3d at 786 (noting the ALJ's "duty to acknowledge potentially dispositive evidence").

Even if, as the Commissioner argues, there is evidence elsewhere in the record to support the ALJ's finding, the ALJ here failed to explain or identify that evidence and build the requisite "logical bridge." *Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011) ("We have made clear that what matters are the reasons articulated *by the ALJ*")

---

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:
     a. Dyspnea, fatigue, palpitations, or chest discomfort....

(emphasis in original). As a result, we find that the ALJ's failure to adequately articulate his step three findings warrants a remand for further consideration of Noble's impairments. *Steele*, 290 F.3d at 938; *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) ("failing to discuss the evidence in light of the Listings analytical framework leaves a court with grave reservations as to whether the ALJ's factual assessment adequately addressed the criteria of the listing"). In reaching this conclusion, we do not render an opinion as to whether Noble in fact meets or medically exceeds Listing 4.02, only that the ALJ should have analyzed this issue in greater detail.

### D.  The ALJ Erred in Failing to Give Controlling Weight to Treating Physicians.

Next, Noble argues that the ALJ rendered an improper RFC determination because he failed to give controlling weight to the opinions of his treating physicians, Drs. Ashley and Mitchell, and he failed to explain why greater weight was given to the non-examining state agency reviewers. For his part, the Commissioner argues that the ALJ's RFC determination was appropriate and that the ALJ adequately articulated his bases for giving the opinions of the state agency physicians greater weight than the treating physicians.

Generally, an ALJ gives the opinion of a treating physician controlling weight because they are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870 ("more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances") (internal citations omitted). However, a treating physician's opinion is only entitled to controlling weight if it is "well-supported

21

by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." 20 CFR § 404.1527(c)(2); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). While different medical opinions must be considered in evaluating a claimant's medical impairments, "the final responsibility for deciding the issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2). The ALJ is free to discount the opinion of the treating physician so long as he provides good reasons for doing so. 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870.

We agree with Noble that the ALJ failed to provide an adequate explanation for disregarding the opinion of Dr. Mitchell. The ALJ stated that Dr. Mitchell's opinion was not entitled to controlling weight because her treatment records reflect little more than follow up appointments. However, as Noble correctly notes, the ALJ does not demonstrate that Dr. Mitchell's opinion is internally inconsistent or that it is contradicted by evidence elsewhere in the record, and the ALJ's statement that Dr. Mitchell's records merely reflect "follow up" appointments is not supported by the record. Indeed, Dr. Mitchell conducted several physical examinations and ordered numerous tests, including metabolic testing, echocardiograms, chest x-rays, and spinal imaging. In addition, Dr. Mitchell's referral to Dr. Bhan led to the implantation of a defibrillator, and her diagnosis of dilated cardiomyopathy was corroborated by Dr. Ghani and Dr. Silver. The ALJ stated that Dr. Mitchell's limitations on Noble's RFC are contradicted by an earlier report in which she stated that there were no restrictions on Noble's physical activity. However, the previous report was dated eighteen months prior to her final medical assessment and Noble's condition had changed in this time. By failing to adequately articulate his reasons for discounting the opinion of a treating physician, the

ALJ has failed to build the requisite logical bridge, and we find that a remand is warranted on this ground.

Similarly, we also agree that the ALJ's decision fails with respect to the weight given to the opinion of Dr. Ashley. The ALJ concluded that "full weight cannot be given to Dr. Ashley's opinion that the claimant is totally and permanently disability [sic]" because "that opinion is inconsistent with the findings in Exhibit 9F." (R. 30.) First, we note that because the Commissioner retains the sole authority to determine whether a claimant is disabled, the ALJ was correct in discounting Dr. Ashley's opinion that Noble was disabled. See 20 C.F.R. § 404.1527(e)(2); *see also Kapusta v. Sullivan*, 900 F. 2d 94, 97 (7th Cir. 1990). However, the ALJ's reasoning for not giving Dr. Ashley's opinion controlling weight is insufficient. Exhibit 9F contains Dr. Ashley's notes from Noble's office visits, and the ALJ fails to point to any specific piece of information that contradicts Dr. Ashley's ultimate findings. In fact, these notes indicate that Noble reported suffering from shortness of breath, fatigue, palpitations, and chest pains. Moreover, Dr. Ashley is a cardiologist, a specialist in the relevant medical field here. See 20 C.F.R. § 404.1527(d)(5) ("[w]e generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). For these reasons, we find that the ALJ was required to better articulate his reasons for discounting Dr. Ashley's conclusions.

Instead of giving controlling weight to either of Noble's two treating-physicians, the ALJ relied on the opinions issued in 2008 by two state-agency reviewers. The ALJ afforded the state-agency reviewers "significant weight." The Agency's own regulations require that when evidence comes in the form of a medical opinion from a state agency

physician, an ALJ "must explain the weight given to the opinions in their decisions." 20 C.F.R. § 404.1527(f); *McKinzey v. Astrue*, 641 F.3d 884 (7th Cir. 2011) (emphasis added). Here, the ALJ failed to provide an adequate explanation for his decision to give the state agency physicians' opinions controlling weight. This is particularly troubling in light of the fact that these opinions were rendered well over a year before the medical assessments of Dr. Mitchell and Dr. Ashley, and prior to the time when Noble's condition required the implantation of the defibrillator. *See, e.g., Jelinek*, 662 F.3d at 812 (finding that the ALJ would be "hard-pressed to justify casting aside [the treating physician's] opinion in favor of these early state-agency opinions," which were two years old). In light of these errors, on remand the ALJ must reevaluate whether Dr. Mitchell and Dr. Ashley's opinions are entitled to controlling weight and whether the state agency reviewers' opinions should be afforded less weight.

### E. The ALJ's Credibility Analysis Was Not Patently Wrong.

Finally, Noble contends that the ALJ erred in making his credibility determination by relying on unreasonable grounds and failing to consider the testimony of Noble's wife. To succeed on this ground, Noble must overcome the highly deferential standard afforded to the ALJ's credibility determination. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). An ALJ's credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted).

When reviewing an ALJ's credibility determination, we are limited to examining whether the ALJ's determination was "reasoned and supported," *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) (citations omitted), and will overturn the determination

only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citation omitted). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong and deserving of reversal." *Elder*, 529 F.3d at 413-14 (internal quotation marks and citations omitted). Nevertheless, the ALJ is still required to "build an accurate and logical bridge between the evidence and the result[.]" *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (internal quotation marks and citation omitted). "In analyzing an ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." *Id.*

In making his credibility determination, the ALJ discussed the evidence in the record, including Noble's appearance, his testimony at the hearing, and the medical evidence. The ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (R. 25.) The ALJ also stated: "the minimal activities of daily living described at the hearing were considered and lend some support to his claims, but they are not sufficient to overcome the medical evidence which is most probative." (R. 28.) In particular, the ALJ noted that although Noble testified that he falls asleep easily, does very little activity and spends the majority of his day in bed, these limitations were not supported by medical or treatment records. Indeed, Dr. Silver noted that there was no reason Noble could not return to work, and the administrative record indicates that Noble took two vacations during this time period. Of course, a claimant's vacation does not necessarily rule out a finding of disability; however, under the facts here, the ALJ's finding that Noble's symptoms and limitations were somewhat exaggerated is not "patently wrong." *See,*

25

*e.g., Reider v. Astrue,* No. 07-C-7271, 2007 WL 2745958, at *11 (N.D. Ill. July 11, 2007) (affirming the ALJ's credibility finding where the claimant had taken two vacations since the disability onset date).

Noble also argues that the ALJ erred in failing to consider his wife's testimony in making his credibility determination. However, it is well settled that "an ALJ's 'adequate discussion' of the issues need not contain a 'complete written evaluation of every piece of evidence.'" *McKinzey,* 641 F.3d at 891. Even if the ALJ's discussion of the issues was not perfect, we do not find that it was patently wrong. *See Schreiber v. Colvin*, No. 12-2602, 2013 WL 1224905, at *9 (7th Cir. Mar. 27, 2013) (noting that even if the ALJ's credibility analysis was not necessarily "ideal," remand was not warranted because the ALJ's decision was supported with some reasonable and logical discussion of the evidence). Ultimately, the ALJ concluded that Noble's fatigue-related symptoms caused some limitations on his ability to function (although not to the extent that Noble alleged), and this finding is reflected in the ALJ's RFC determination. Given the deferential nature of our review of this credibility finding, we will not remand the ALJ's decision on this ground.

## III. Conclusion

For the reasons set forth above, Noble's motion for summary judgment is granted. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

Dated: April 29, 2013

The Honorable Michael T. Mason